**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| **OTTO LADDER SAFETY, INC.,** | ) | |
| 11686 Deerfield Dr | ) | |
| Oakton, VA, 22124, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Civil Action No.:** |
| v. | ) | |
| | ) | **JURY DEMAND** |
| **PETER SPARBER,** | ) | |
| 220 Walnut Ln NW | ) | |
| Vienna, VA 22180, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF</u>

Plaintiff OTTO LADDER SAFETY, INC. for its Complaint for Injunctive and Other

Relief against Defendant PETER SPARBER states as follows:

## <u>INTRODUCTION</u>

1.      Otto Ladder Safety, Inc. ("Otto") is an early stage company that is developing smart

ladder technology and products, owning several utility patents relating to ladders containing built-

in technology to track, in real time, the movements of individuals at height to better protect those

individuals and ensure safe operation. For the past seven years, Defendant Peter Sparber

("Sparber") has been closely affiliated with Otto, serving a number of roles including co-founder,

Chief Executive Officer, for a time, and, until this past Monday, Chairman of Otto's Board of

Directors.

2.      Sparber's departure was unplanned and remarkable. That is, because, over the last

week, Otto discovered a months-long plot by Sparber, its then-but-now-former Chairman of the

Board of Directors and significant shareholder, to erode Otto's customer relationships, to interfere

in a licensing agreement which Otto is currently negotiating, and to attempt to sow discontent

amongst the directors and major shareholders of Otto for purpose of sabotaging Otto's ability to compete in the newly emerging smart ladder market.

3.     Making Sparber's actions more egregious, he carried out his plans from the highest position of trust and repose held within Otto, intentionally interfering with Otto's negotiations with a vendor and encouraging the Board of Directors to substantially modify Otto's business model so as to cease pursuing the commercialization of ladder use data so that Sparber and his new venture could surreptitiously pursue that business, and drive down the value of Otto to a point where his new venture could obtain access to Otto's issued-patents and so Sparber and his new venture would emerge as the new company.

4.     These continuing malicious and opportunistic actions have significantly threatened Otto's business, its trade secrets, its actual and potential business relations, and its customer relationships. Through this action, Otto seeks to bring an immediate end to Sparber's scheme, through a temporary, preliminary, and ultimately a permanent, injunction to protect Otto's business, its customer relationships, goodwill, and its trade secrets, and to recover the damage already caused by Sparber.

## <u>NATURE OF THE ACTION</u>

5.     This is an action for breach of contract, breach of fiduciary duty, misappropriation of trade secrets, and tortious interference with contract and business expectancy. Otto seeks temporary, preliminary, and permanent injunctive relief, in addition to other damages.

6.     For many years, falls from heights have topped the list of OSHA's major hazards. From Otto's research, it has found that the U.S. economy loses more than $24B annually due to ladder falls, with more than 300 deaths and approximately 500,000 injuries occurring annually.

2

7.      Otto is a first-of-its-kind technology company focusing on combining innovative technology with real-time alerts to revolutionize worksite safety. Otto's technology is intended to reduce accidents and lost time, improve risk management, lower injury costs, and help the construction industry assess potential fraudulent claims.

8.      Otto owns the patents for and is in the process of introducing to market, through a licensed vendor, smart ladders, focusing on safety for workers at heights. Otto is effectively the brainchild of a three-company venture between: (a) Nowledge, Inc. (a former company headed by Sparber and Ellen Giuntini, Otto's current CEO ("Giuntini")), which specialized in data collection; (b) Stress Engineering Services, Inc. ("Stress"), which developed the sensor technology; and (c) TSC Tech Strategies, LLC, a New Jersey limited liability company, which held relationships within the construction industry, including a significant understanding of unions, that will allow Otto to successfully bring its products to market.

9.      At its core, sensors embedded into each piece of Otto-enabled equipment feed data to an onboard analytics platform, with Otto's analytics assessing the information in real-time and alerting a user that they are in an unsafe situation, allowing the worker to self-correct and avoid a fall that could leave them injured or worse.

10.      Beyond the real-time alerts, data from the equipment is captured, stored securely, and used to provide actionable insights, such as types of unsafe behavior, problem areas at worksites, as well as asset and worker utilization.

11.      Because of the disruptive nature of Otto's technology to the construction market place, Otto has been able to convince a major player in the construction equipment rental market ("Customer A") to commit to a multimillion dollar contract to purchase ladders built pursuant to Otto's patents.

3

55517163.1

12.     Otto has also had tremendous success generating interest among unions, and their union contacts would be considered among Otto's customer base, and in fact, in many ways Customer A's interest in Otto's ladders is largely driven by unions wanting to have access to these ladders.

13.     Otto's ladders are to be built by a manufacturer, who will license the technology from Otto, and pay Otto a royalty for each ladder manufactured and sold ("Vendor A"). Per the terms with Vendor A, Otto would retain the rights to the data collected through the built-in sensors, for further monetization of that.

14.     Until recently, Sparber served as the Chairman of Otto's Board and was a highly-compensated independent contractor who was awarded hundreds of thousands of shares in the company, potentially worth millions of dollars, and being paid nearly $300,000 in fees over a period of less than the last two years.

15.     During the course of his association with Otto, Sparber was exposed to and helped Otto develop confidential information relating to its business strategies, product offering, product development, launch dates, market focus, selling strategies, and pricing with respect to Otto's smart ladders and other planned products.

16.     On Monday, April 28, 2025, the Otto Board voted to replace Sparber as Chairman of Otto. This decision was driven by Sparber's proposal to significantly alter its business model by not pursuing the commercialization of ladder use data, drive the company to operate in a stripped-down fashion and eventual sale, and based on his known and identified mixed messages he was providing to different directors and stockholders.

4

17.     The following day, Otto discovered Sparber's scheme and further located significant and damning emails detailing his plan to sow discontent amongst the directors and major shareholders of Otto and his plan to supplant Otto in the market.

18.     In particular, Sparber was attempting to coerce another now-former Otto Board Member and Vendor A to enter into a joint venture or partnership whereby Sparber would utilize his position in Otto to steer the company in such a direction whereby this partnership could secretly acquire Otto's intellectual property and the right to commercialize ladder user data and replace Otto in the market for smart ladders.

19.     Following Otto's discovery of his plot and making Sparber's efforts all the more egregious, Otto discovered highly detailed plans, drafted by Sparber, to essentially weaponize Otto's sales and marketing force on his new venture's behalf, poach Otto's talent, and fund the new venture through work by the now-former Otto Board Member's side business, Nove, all for the goal of obtaining a second, more lucrative purchase order from Customer A, while artificially stifling production of ladders through Vendor A during the first purchase order. The seeming end goal of Sparber's scheme was to utilize his position as Chairman of Otto's Board to coerce Otto to sell within the next twenty months so his newly formed venture with Vendor A and the now-former Otto Board Member would be positioned to take over the market.

20.     Sparber's actions violate his contractual and fiduciary obligations to Otto, constitute trade secret misappropriation, and are tortiously interfering with Otto's business expectancy. Sparber has actually misappropriated and threatens to continue to misappropriate Otto's trade secret and confidential information, including, but not limited to, its business strategies, contract terms, customer relationships, among other things.

21.    Accordingly, Otto seeks to temporarily, preliminarily, and permanently enjoin Sparber from using or threatening to use or inevitably using Otto's trade secret and confidential information, and from interfering with Otto's business, customers, and actual or potential vendors.

22.    Absent such injunctive relief, Otto faces irreparable injury, including the loss of its customers, its prospective vendor relationship, its competitive advantage, its confidential information, and its goodwill in amounts that may be impossible to determine unless Sparber is enjoined and restrained by order of this Court.

## PARTIES, JURISDICTION, AND VENUE

23.    Plaintiff Otto Ladder Safety, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Oakton, Virginia.

24.    Defendant Sparber is domiciled in and a resident of Vienna, Virginia.

25.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Otto's Defend Trade Secrets Act ("DTSA") claim, brought under 18 U.S.C. §1836, et seq., raises a federal question. This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(a).

26.    This Court has personal jurisdiction over Sparber, and venue is proper in this District under 28 U.S.C. § 1391(a) as Sparber is domiciled in this District. Venue also is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Otto's claims occurred in this district. Sparber committed and continues to commit tortious acts in and/or related to this State, as well as having performed acts that constitute doing business within this State. Additionally, Otto's principal place of business is in this District, and it regularly conducts business in Virginia.

## EVENTS GIVING RISE TO THIS ACTION

### OTTO'S OVERARCHING BUSINESS

27.     At its core, Otto is a worker safety data company, positioned to mitigate $24 billion in annual losses from workplace injuries, through the licensing of its first-of-its-kind smart ladder technology.

28.     Specifically, Otto owns several utility patents in the United States and around the world, with its technology accumulating and analyzing data from digital sensors embedded in everyday products used by workers, with an emphasis on providing safety to workers who are working from heights.

29.     Through its data capture technology, Otto seeks to prevent accidents and creates loss management insights for industries suffering major industrial safety losses.

30.     Identifying what it perceived to be a gap in the construction industry, Otto was formed to help not only avert accidents but provide objective data gathered before, during and after the accident to help prevent and minimize future accidents.

31.     Otto's technology detects and instantly alerts workers and supervisors of risky behavior while analyzing all relevant data for training, benchmarking, accident and fraud investigations.

32.     Otto also offers an online app, available through Google Play and the Apple App Store, which allows end users, irrespective of ladder manufacturer, to upload ladder inspection information.

33.     Otto's business model has three main components. First, Otto licenses its patents to an end-manufacturer who manufactures and sells ladders Otto's tech-enabled ladder. Through this, Otto receives a royalty fee per each ladder sold. Second, Otto sells a subscription fee for data

7

and reports captured, which it manages and built-out internally. <u>Third</u>, Otto offers the aforementioned mobile app.

34.    Otto markets its products to users throughout the United States, and its sales and marketing plans have focused heavily on urban areas on the East and West coast. Otto also benefits from its three main partners (Stress, TSC, and Nowledge) occupying three different geographic areas (the southwest, northeast, and southeast, respectively).

**O<span style="font-variant:small-caps">TTO'S</span> C<span style="font-variant:small-caps">ORPORATE</span> H<span style="font-variant:small-caps">ISTORY</span> & S<span style="font-variant:small-caps">PARBER'S</span> R<span style="font-variant:small-caps">OLE IN</span> S<span style="font-variant:small-caps">AME</span>**

35.    As mentioned above, Otto is effectively the brainchild of three separate companies, and was formed approximately six and a half years ago.

36.    On November 7, 2018, Stress assigned certain patents to Otto. These patents are utilized in Otto's products and anticipated products.

37.    Several weeks later on November 27, 2018, Otto entered into a Founder Control Agreement, with Sparber being identified as the CEO of Otto. Along with Sparber, the other stockholders of Otto were identified as Giuntini, and three other unrelated individuals.

38.    That same day, and as discussed in greater detail below, Otto and Sparber entered into the Independent Contractor Agreement (<u>Exhibit 1</u>) (the "Agreement"), which includes certain restrictive covenants. In exchange for Sparber entering into the Agreement, Otto issued Sparber 200,000 shares of Otto common stock.

39.    Over the course of the next several months, Otto's overall structure changed, with first Stress and Nowledge joining as stockholders of Otto, and then eventually TSC joining.

40.    Initially, Nowledge, Stress, and Otto entered into an Amended and Restated Stockholder Agreement dated May 9, 2019.

41.    By mid-summer, TSC was added to the joint venture by way of a Non-Binding Memorandum of Understanding, which was memorialized thereafter through a new stockholder agreement.

42.    Effective December 10, 2019, Nowledge and Otto entered into a Master Service Agreement, through which Nowledge would be tasked with utilizing its production-ready big data platform to support Otto with its data analytics and communication packages for Otto's portable ladders, temporary scaffolds, associated construction site data connectivity systems and associated data products for sale and/or lease in commercial construction. This MSA required exclusivity between Nowledge and Otto. Sparber signed the MSA on Nowledge's behalf as its then CEO. This MSA included a confidentiality provision prohibiting disclosure by Nowledge of Otto's trade secrets and confidential information and vice versa.

43.    On December 13, 2019, Otto, Stress, Nowledge, and TSC entered into the Second Amended and Restated Stockholder Agreement. All of Stress, Nowledge, and TSC were referred to as a "Founder." Sparber signed this Agreement on behalf of Nowledge. Through the Agreement, the Founders and Otto made certain promises, including entering into certain confidentiality agreements, whereby the parties agreed not to use Otto's or each other's confidential information for improper purposes.

44.    On September 23, 2021, Stress, Nowledge, and TSC, along with Otto, entered into a Founder Agreement. Through the Founder Agreement, these parties amended and replaced their original December 13, 2019 agreement. Included in this agreement was a provision by which a founder would be preauthorized to transfer all or any portion of the shares of that founder to its shareholders or owner.

45.    Further the September 23, 2021 Agreement also contained a detailed confidentiality provision, inuring to the benefit of each Founder and Otto, and requiring each Founder and Otto to protect any confidential information of Otto or the other Founders disclosed through this relationship. Sparber again executed the agreement on Nowledge's behalf.

46.    Effective April 22, 2024, the parties entered into an Amendment to the Founder Agreement, whereby Nowledge's role as a founder was subsumed by Sparber and Giuntini, and with Nowledge thereafter ceasing to exist.

47.    Importantly for purposes of this current dispute, this means that Sparber owes Otto the same confidentiality obligations as Nowledge had owed Otto under the Founder Agreement.

**S**PARBER'S **C**HAIRMANSHIP **& C**ONTRACTUAL **O**BLIGATIONS **O**WED TO **O**TTO

48.    Prior to Sparber's involvement with Otto, he had had no background in manufacturing construction equipment, and, prior to his involvement with Nowledge, he had had no background in big data.

49.    Instead, over the course of his career, Sparber was involved in public affairs and public relations, starting as a Director of Public Relations for the New Jersey Hospital Association (1974-1978), then serving as a VP of Public Affairs for Blue Cross Blue Shield of Delaware (1978-1980), the VP of Public Affairs for the Tobacco Institute (1980-1988), and then serving as a political and commercial consultant for the energy, industrial chemical, transportation, pharmaceutical, and electronics industries (1988-2008).

50.    By 2018, Giuntini and Sparber were affiliated together in Nowledge, a big data platform. Prior to Nowledge, Giuntini had worked with American Management Systems, Inc., a high-tech and management consulting firm. Prior to its involvement with Otto, and subsequent dissolution, Nowledge offered big data infrastructure, security and data protection services.

10

51.     Upon formation of Otto, Otto engaged Sparber to serve in a number of roles, including, at one time, Chief Executive Officer, and eventually Chairman of the Board of Directors.

52.     As a function of his positions, Otto gave Sparber access to Otto's confidential and proprietary information, and Otto also entrusted him with its highly valuable customer and vendor relationships. Due to his position within Otto, Sparber had access to and knowledge of Otto's most valuable information.

53.     Through the trust and repose Otto placed in him, Sparber was exposed to and formed business relationships with, and was exposed to and helped develop confidential information on Otto's behalf regarding Otto's customers and programs and services.

54.     At the outset of his involvement with Otto, Sparber signed the Agreement. Through the Agreement, Sparber acknowledged that he would receive and protect Otto's confidential information. (Agreement ¶ 3.)

55.     Further, in signing the Agreement, Sparber agreed that Otto's "Confidential Information" included but was not limited to:

> [S]ales and marketing information, ideas, source code, business plans, financial information, concepts, specifications, designs, artwork, know-how, processes, or other information that by its nature is generally considered proprietary and confidential. If performing work for our clients, the client's identity and the nature of the project will be "Confidential Information" when that information is deemed confidential by us.

(Id.) Moreover, pursuant to the Agreement, Sparber was required to return all Confidential Information to Otto upon the termination of his engagement, and was prohibited from using such information "for any purpose." (Id.)

56.     Sparber also agreed to certain reasonable, post-engagement restrictions through the Agreement.

11

57.     In particular, as it relates to his non-competition obligations, he agreed that:

**Non-compete**. During the Term and for six (6) months from the date of the voluntary or involuntary termination of this Agreement, you shall not, within any geographic area in which you have worked for the Company or otherwise have had duties or responsibilities for the Company, directly or indirectly, hold any ownership interest in (except as a stockholder of a public company in which you own less than five percent (5%) of the issued and outstanding capital stock of such company), manage, control, serve on the Board of Directors of, or render services of any kind in any capacity to any person or entity engaged in the development, manufacture, marketing, distribution, or sale of any services or products of the same general type, which perform similar functions, or which are used for the similar purposes as any product or service that is then or was during your last year of employment with the Company being developed, manufactured, marketed, distributed or sold by the Company.

You understand and acknowledge that (i) the products and services of the Company encompassed by this Section include sensor-enabled smart ladders and any other products or services developed or sold during the term of this Agreement; and (ii) the geographic market in which you work or have other duties and responsibilities for the Company is the U.S. You understand and acknowledge, however, that the foregoing description of the Company's products and services and geographic market may change, and the provisions of this section shall apply to the Company's products and services and all geographic areas in which you have worked for the Company or have otherwise had duties or responsibilities for the Company.

(Id. ¶9.)

58.     Further, as it relates to his non-solicitation obligations, he agreed that:

**Non-Solicitation of Contacts.** During the Term and for six (6) months from the date of the voluntary or involuntary termination of this Agreement, you will not, directly or indirectly, individually or collectively in conjunction with others, engage in activities that compete with us by soliciting, servicing, contracting or otherwise engaging for a competing purpose any customer, client, account or contractor for whom you provided Services and who had a business relationship with us, or cause or attempt to cause any existing prospective customer, client, account or contractor for whom you provided services and who had a business relationship with us during the Term to divert, terminate, limit or in any manner modify, or fail to continue or enter into any actual or potential business relationship with us.

(Id. ¶8.) Sparber also agreed not to solicit Otto's employees through the Agreement. (Id. ¶7.)

59.     Through the Agreement, Sparber agreed to reimburse Otto for its attorney's fees, costs and expenses based on his negligence, intentional misconduct or omissions, or any breaches

12

of the Agreement. (Id. ¶10.) The Agreement also contains a Delaware choice-of-law provision. (Id. ¶11.)

**OTTO'S PROTECTION OF ITS CONFIDENTIAL INFORMATION AND TRADE SECRETS**

60.     Because of the critical nature of Otto's confidential and trade secret information and how it is critical to Otto's success as an early-stage technology company, Otto closely guards its confidential information. Otto takes specific measures to restrict access to and preserve the confidentiality of this information, including, but not limited to:

> a.   Entering into detailed confidentiality agreements between and amongst the founders, and requiring those founding companies to ensure confidentiality within their organizations;

> b.   Entering into confidentiality agreements with people affiliated with Otto, like Sparber;

> c.   Restricting access to computerized information through the use of passwords and a password-protected shared drive on its VPN network, and encrypting confidential data on the servers;

> d.   Entering into non-disclosure covenants with its suppliers and clients to restrict what information regarding the relationship may be disclosed to third parties;

> e.   Removing access to Company email and confidential information upon termination or release.

61.     Otto rigorously maintains the confidentiality of its information because it provides Otto a competitive advantage in the marketplace from which Otto derives economic value.

62.     Any Otto competitor—including Sparber and any third-party he enlists to unfairly compete against Otto—who possesses or uses Otto's confidential information would gain an immediate and unfair competitive advantage in the marketplace.

63.     Possession and use of this information would enable competitors to, among other improper advantages: (a) develop trade secret and confidential and proprietary information without

expending any time or resources, let alone the same degree of time and resources that Otto expended; (b) quickly develop pricing strategies and services to unfairly compete with Otto to diminish or erode Otto's marketplace standing and customer relationships; (c) discover initiatives that should not be pursued; and (d) benefit from a customer and/or vendor relationship that first started with and was nurtured and developed by Otto.

### OTTO BEGINS TO SUSPECT SPARBER OF BAD ACTS

64.    By 2023, Otto began cultivating a relationship with Customer A by selling Customer A on the vision of Otto's technology. This effort was spearheaded not by Sparber, but by others within Otto, including but not limited to Brian Jones, Otto's COO, and Giuntini.

65.    In August 2024, following the termination of a licensing and manufacturing agreement with a separate manufacturer, Otto was introduced to Vendor A. This introduction came from an individual at Stress and not through Sparber.

66.    Following this introduction, Otto and Vendor A entered into a non-disclosure agreement, whereby Otto provided its technology to Vendor A. Vendor A, thereafter, created a prototype of the ladder and conducted field testing, and is prepared to begin manufacturing the smart ladder.

67.    Simultaneous with these efforts by Vendor A, Otto engaged in an extensive marketing campaign to demonstrate the commercial value of its product. The results of that marketing campaign was subsequently shared with Customer A.

68.    As a result of these efforts Customer A placed an order with Vendor A for the delivery of ladders supplied with Otto's technology with first deliveries to occur in July 2025.

69.    During the timeframe after Otto was introduced to Vendor A, Giuntini was responsible for negotiating a licensing and manufacturing agreement with Vendor A. However,

despite Giuntini being responsible for these negotiations, Sparber began communicating with Vendor A. For months, though, while an overarching framework was decided, including the royalty rate per ladder sold, for reasons then unexplained, no licensing and manufacturing agreement with Vendor A was able to be executed.

70.     These issues began to come to a head in Spring 2025, when Customer A was nearing finalization of its purchase order of these ladders, and Otto was simultaneously working toward finalizing the data capture portion of its product offering.

71.     On April 2, 2025, the now-former Otto Board Member made a proposal to replace the current vendor on the data capture and analysis side of Otto's business through his company "Nove." After weighing the proposal, Otto eventually rejected it.

72.     On April 9, 2025, Giuntini sent an email to Vendor A's CEO, after numerous conversations, to memorialize their agreement on key points, to which Vendor A subsequently agreed orally on April 14, 2025.

73.     Given the important directional decisions Otto was facing, a board meeting was set for April 28, 2025. But, in the lead up to the April 28, 2025 board meeting, Otto began to suspect that Sparber was not acting in Otto's best interests.

74.     On or about April 21, 2025, a draft agenda for the upcoming Board Meeting was circulated between Sparber and Giuntini. In it, one of the items to be considered was the status of the CEO and Chair.

75.     On April 24, 2025, responding to the proposed agenda, Sparber sent an email, writing, among other things, "The questions around CEO and Chair will waste a lot of time better spent discussing where Otto is headed."

76. Sparber seemingly suggested a different agenda order because he wanted to front the discussion with his newly-unveiled plan to strip the company down and sell it. To that end, on April 22, 2025, Sparber circulated three documents that he planned to present at the April 28, 2025 board meeting. In one of the documents, Sparber presents a plan that Otto operate as a stripped-down licensing-only company that does not pursue the commercialization of ladder user data, with a plan to exit and sell the business within the next 20 months. This was not a plan that had been previously discussed.

77. On April 26, 2025, Sparber sent an email out to select Otto stockholders, in which he detailed his plan along with the now-former Otto Board Member to present a proposal to exiting Otto in 20 months, proposing that Otto commit to a licensing model and not compete with Vendor A.

78. Moreover, prior to the meeting, Sparber had spoken to the principals of Stress (Jack Miller) and TSC (Jim Bifulco), and the message that he was presenting to both suggested that Otto was being severely mismanaged by Otto's CEO and was on the verge of bankruptcy.

79. Prior to the meeting, Miller, Bifulco, and Giuntini all compared notes and determined that what Sparber was saying to Miller and Bifulco was not supported. Based on these communications, Miller, Bifulco, and Giuntini began to question why Sparber was proposing a stripped-down company being prepared for sale.

80. Accordingly, prior to the meeting, a decision amongst certain of the other board members was made to vote to replace Sparber as Chairman of Otto, and Giuntini had put Otto's IT on alert to be prepared to block Sparber's access to his Otto email account at her word.

81. As the meeting began, Sparber requested that Otto permit several people who were not members of the Board or legal counsel to attend the meeting, including Vendor A's CEO and

16

several stockholders, seemingly with the goal of "selling" his 20-month exit vision and stripped-down Otto. The Otto Board rejected this request.

82.    Sparber then proposed to take the meeting agenda items out of order, but the Otto directors again rejected this request.

83.    Following his rejected request, the Board elected a new Chairman, Miller, which was an agenda item.

84.    Through the meeting, the Board further rejected Sparber's additional proposals, and elected to terminate his services.

85.    Miller, as new Board Chairman, initiated and led a discussion regarding the need for directors to not interfere with management's operation of the business, and shared that several vendors and prospective partners had expressed confusion when receiving inconsistent communications from Otto's management and one of its directors. The Board eventually concluded that interference by directors in management of Otto creates uncertainty and undermines management, and that all directors must cease external communications directly with third parties and with investors and stockholders.

86.    In response to this, Sparber told the Board that this was not going to stop him from continuing to do everything he was already doing.

87.    In the aftermath of the Board's directive that directors must cease external communications, Sparber and the now-former Otto Board Member voluntarily resigned their board seats, on April 30th and April 29th respectively.

88.    On April 29, 2025, Otto's CEO, Giuntini, and Otto's new Chairman, Miller, spoke to Vendor A's CEO. During the call, Vendor A's CEO shared that Customer A had sent Vendor A a commitment letter for at least 2,500 ladders and the prepayment to Vendor A will be made

17

next week. During the call, Otto stressed the need to finalize and execute the license agreement, but as of the date of this filing, the license agreement has not yet been executed between Vendor A and Otto.

**OTTO DISCOVERS EMAILS EVIDENCING SPARBER'S BAD ACTS**

89.     Following the meeting and following Sparber's removal, Otto cut off Sparber's access to his Otto email account. The following day, the email account was accessed and examined. What Otto learned from this examination only confirmed its worst fears about Sparber's pre-removal conduct.

90.     Specifically, it learned that in the months leading up to his removal, Sparber had been attempting to convince Vendor A to not enter into a manufacturing agreement with Otto, and instead form a joint venture with Sparber and the now-former Otto Board Member. His actions were deliberate and, while Otto was negotiating with Vendor A to enter into a licensing agreement, instead Sparber was taking specific steps to badmouth Otto, its leadership, and Otto's ability to function as a going entity.

91.     Putting the subsequent comments in context is important, albeit difficult. The important items to remember are that: (a) Otto was in negotiations with Vendor A for Vendor A to manufacture Otto's smart ladder, with Vendor A licensing Otto's patents and paying Otto a royalty on sales of the smart ladder; (b) Giuntini was responsible for negotiating with Vendor A on Otto's behalf to enter into a licensing agreement, but Sparber was communicating with Vendor A; (c) Vendor A made significant investments on its own to manufacture a prototype of the ladder utilizing the Otto technology; and (d) Otto and Vendor A, while having signed an NDA and orally agreeing to overarching terms in April 2025, had yet to enter into a licensing agreement.

92.     While Otto's investigation into Sparber's malfeasance is in its infancy, it has discovered the following so far.

93.     On January 18, 2025, Sparber sent an email and "Rough Draft Otto Business Plan" with the subject line "Otto exit plan" to Vendor A's CEO and the now-former Otto Board Member. In the body of the email, Sparber wrote:

> I had fun drafting the attached document – the path to a big exit which will dominate everything in Otto, keep them focused on selling just the first ladder, maintain [Vendor A]'s and our control of all manufacturing and market channels and set the stage for a much better smart ladder family.
>
> ***
>
> Otto is acquired and we hold the IP and licenses for what matters.

94.     On February 6, 2025, Sparber sent an email to Vendor A's CEO and the now-former Otto Board Member with the subject line "Draft 2 on [Vendor A CEO]-[now-former Otto Board Member]-Peter collaboration." Through the several page email, Sparber discusses the plan to supplant Otto with Customer A, develop a smart ladder to eventually replace Otto once Customer A issued a second purchase order, and pitching a series of ideas for this collaboration to consider that would be within Otto's intended business scope.

95.     On February 18, 2025, Sparber sent an email to Vendor A's CEO providing him with a copy of Otto's Cap Table. A capitalization "cap" table is a document that provides a snapshot of a company's ownership structure, detailing who owns what percentage of a company's shares. Cap tables are crucial for startups and early-stage businesses, and are highly confidential documents. Despite the party's NDA, no legitimate reason exists for Sparber to have sent Otto's cap table to Vendor A's CEO.

96.    On March 18, 2025, Sparber sent an email to Vendor A's CEO and the now-former Otto Board Member attaching a partnership agreement. In the email, Sparber makes clear that he is attempting to take Otto's business model and reproduce it in a new company, writing:

> The way I see it, there are two manufacturing entities feeding revenue into Nove.
>
> The first one is [Vendor A] producing things like smart ladders, etc. [Vendor A] makes a profit from the sale of these products to companies like [Customer A], and pays Nove royalties TBD.
>
> The second entity (company 3) "makes" and sells reports/insights using data from smart ladders, etc. The definition and sale of the data products is conducted by Nove, the coding of the products by Company 3 marked up at a rate consistent with the [Vendor A] margins, and with the resulting revenue to Nove divided equally among the partners.

97.    As discussed above, Nove was the business of the now-former Otto Board Member. Otto, however, had no understanding prior to finding this email after Sparber's termination that Nove, Sparber, and Vendor A were somehow potentially aligned in a common purpose.

98.    On March 24, 2025, in response to his own email on March 18, Sparber sent a new email, proposing a series of three calls. Outlining his plan for the second of three calls, Sparber wrote, "Money. I expect to move at least $200K from Otto to [ ]/Nove. Otto has some money and when the PO is issued, we will have another $500K."

99.    That same day, and in response to his prior March 24, 2025 email and again to Vendor A's CEO and the now-former Otto Board Member, Sparber wrote about the long-unexecuted licensing agreement with Vendor A, for which Sparber had no responsibility to be negotiating on Otto's behalf: "One other thing – we need to draft a licensing agreement which makes sense under the circumstances. I suggest it be very simple and direct, tied only to the first PO, and at some reduced royalty rate because of the costs [Giuntini] caused. This is needed now to calm nerves. I can sign it for Otto but will get Board approval first."

20

100.    On April 4, 2025, Sparber sent an email to Vendor A's CEO and the now-former Otto Board Member planning on sending an email to the company supporting the now-former Otto Board Member's proposal to serve as an outside vendor through his company, Nove. The email that Sparber circulated further illustrates Sparber's plan outlined in the March 24, 2025 email, in which he indicated that "I expect to move at least $200K from Otto to [ ]/Nove." This appears to be part of a broader plan to obtain some level of "financing" from Otto while hiding Sparber's true intentions.

101.    On April 10, 2025, Sparber sent an email to Vendor A's CEO and the now-former Otto Board Member calling Otto's CEO "stupid," and further claiming that "we are headed fast to the time when the Otto IP is worthless and maybe there now." Finally, Sparber questions why Vendor A would provide any royalty payment to Otto. This email appears to have been sent in response to Otto rejecting Nove's proposal and the drying up of the $200,000 that Sparber predicted being moved to the new partnership in his March 24, 2025 email.

102.    On April 18, 2025, Sparber sent an email to Vendor A's CEO with a memo outlining his plan for the new venture to obtain Customer A's second purchase order, and not Otto. On the second page of the memo, Sparber cites the importance of unions to the future of the smart ladder industry. On the fourth page of the memo, Sparber outlines a plan to recruit away Brian Jones, Otto's Chief Operating Officer. He further outlines his plan to try to push Otto to become a "barebones licensing company."

103.    That same day, Sparber sent an email to Vendor A's CEO, attaching a partnership agreement between Sparber, Vendor A's CEO, and the now-former Otto Board Member, urging Vendor A's CEO to sign the partnership agreement and indicating that Sparber would sign it by Monday, April 21, 2025.

104.    As discussed and outlined above, in this same timeframe, Sparber was circulating his proposal to strip down Otto and prepare it for sale within the next 20 months.

**EFFECT OF SPARBER'S CONDUCT**

105.    With Sparber's departure and his knowledge of Otto's confidential and trade secret information and his direct involvement with some of Otto's most valuable customers and vendor targets, Otto stands to lose substantial business as well as losing the value of its goodwill, customer relationships, trade secrets, and confidential and proprietary information, which cannot be adequately addressed at law.

106.    During his time with Otto, Sparber was exposed to and helped develop Otto's confidential and trade secret information related to Otto's customers and offerings, including selling strategies, confidential information relating to customer and vendor preferences, target royalty figures with respect to licensing Otto's intellectual property, as well as other information identified above.

107.    Sparber has been using Otto's trade secret and confidential information, as well as his position of trust and repose, to improperly and unfairly compete against Otto, attempt to usurp Otto's opportunity with Vendor A, and attempt to supplant Otto with Customer A. Moreover, for all Otto knows what it has discovered to date is just the tip of the iceberg. But there is no scenario in which Sparber has not threatened and actually misappropriated Otto's confidential and trade secret information or a scenario where Sparber does not continue to attempt to interfere in Otto's customer relationships and prospective vendor relationships. Indeed, as Sparber brazenly announced during the April 28, 2025 Board Meeting, he was not going to stop, no matter his position with the company.

108.    Sparber is and will continue to erode Otto's standing and goodwill in the construction safety market, which has already cost Otto and potentially will continue to cost it the loss of a substantial amount of business. Otto's confidential information and customer relationships, however, are invaluable, the loss of which would provide an immediate benefit to Sparber, and an equally immediate irreparable detriment to Otto's business.

109.    By definition of his improper efforts to usurp Otto's corporate opportunities using Otto's trade secrets, Sparber has used, threatens to use, and will continue to use Otto's confidential, proprietary, and trade secret information. Sparber has breached and based on his efforts discovered will continue to violate his Agreement and will continue to use Otto's trade secrets and confidential information.

110.    All told, Sparber is causing, threatening, and/or will continue to cause or threaten significant irreparable harm to Otto, including the loss of value of confidential and/or proprietary information, the loss of its customer relationships, loss of goodwill, as well as damage to Otto's reputation and its ability to successfully market its goods and services. Money alone cannot make Otto whole.

## COUNT I
## BREACH OF CONTRACT

111.    Otto hereby repeats, realleges, and incorporates by reference the allegations that are contained in Paragraph 1 through 110.

112.    The Agreement that Sparber executed constitutes a valid and enforceable agreement.

113.    Otto performed all of the duties and obligations it agreed to and owed to Sparber under the Agreement.

114.    Under the Agreement, Sparber is required not to compete against Otto for six months within any geographic area in which Sparber worked for Otto. (See Exhibit 1.)

115.    Sparber was also prohibited for six months from soliciting Otto's customers, clients, accounts, or contractors for whom he provided services and who had a business or prospective business relationship with Otto. Sparber was also prohibited from using Otto's confidential information for any purpose other than Otto business. (See Exhibit 1.)

116.    In breach of the Agreement, Sparber used and disclosed Otto's confidential information in an attempt to solicit one of Otto's key business partners to not do business with Otto and instead do business with the competing company that Sparber was seeking to form with another now-former Otto Board Memmber and Vendor A.

117.    Because of Sparber's breaches and prospective breaches, Otto has been irreparably injured and continues to face irreparable injury. Otto is threatened with losing the value of its confidential and proprietary information, its customer relationships, its prospective vendor relationship, along with income and goodwill, for which a remedy at law is inadequate.

118.    Accordingly, Sparber must be enjoined and restrained by Order of this Court. In addition to a remedy at equity, Otto seeks actual, incidental, compensatory, consequential damages, and attorney's fees.

## <u>COUNT II</u>
## <u>VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. §1832, *ET SEQ.*</u>

119.    Otto hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 110.

120.    The Defend Trade Secrets Act ("DTSA") defines "trade secret" to include all forms and types of financial, business or economic information, including patterns, plans, compilations, methods, techniques, processes, procedures or programs, if (A) the owner thereof has taken

24

reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public. *See* 18 U.S.C. §§ 1836, 1839.

121.    Sparber acquired and used Otto's trade secrets by improper means and without authorization. In particular, Sparber obtained trade secrets from Otto through, *inter alia*, in the course of his position as Chairman improperly using Otto's confidential information and trade secrets, including by using Otto's trade secrets concerning Vendor A and certain internal officers and directors of Otto to improperly solicit them for his own financial gain.

122.    The information that Sparber has used or threatens to continue to use regarding Otto's: (a) customer needs and preferences; (b) pricing and margin information; (c) product development, cost savings strategies, contract negotiation, and long-term strategies; (d) technologies and product development pipeline; and (e) other sensitive, non-public information about Otto, its business, its customers and targets, and its employees and contractors, constitutes trade secrets within the meaning of the DTSA. Such information derives independent economic value from not being generally known to, or readily ascertainable by proper means by, the public; other persons can obtain economic value from its disclosure or use; and it is the subject of significant efforts to maintain its secrecy.

123.    As detailed above, Otto takes reasonable and appropriate measures to protect the confidentiality of the above-described trade secrets.

124.    Sparber knew or should have known that Otto's trade secrets: (a) are confidential; (b) were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use; (c) were developed or acquired by Otto at great expense and effort; (d) are maintained as confidential and are not generally available to the public or Otto's competitors; (e) would provide

25

significant benefit to a competitor seeking to compete with Otto; and (f) are critical to Otto's ability to conduct its business successfully.

125.    As detailed above, Sparber has wrongfully used Otto's trade secrets and failed to return their information, despite contractual obligations to return such information and requests from Otto for Sparber to do so.

126.    By using and/or threatening to using Otto's trade secrets without Otto's consent, Sparber has misappropriated and continues to threaten to misappropriate Otto's trade secrets in violation of the DTSA, which allows injunctive relief for actual or threatened misappropriation of trade secrets.

127.    The information that Sparber has misappropriated and continues to threaten to misappropriate describes and relates to Otto's highly confidential business relationships and strategic plans, which involve products that are sold in, utilized throughout, and/or travel through interstate commerce.

128.    Should Sparber continue to disclose or threaten to disclose Otto's trade secrets, the disclosure of such information will harm and/or threaten to harm Otto and its legitimate business interests.

129.    Sparber's actions were willful and malicious.

130.    If information pertaining to Otto's trade secrets are disclosed by Sparber to competitors of Otto, it could destroy Otto's competitive advantage.

131.    Because Sparber's misconduct is ongoing and it poses a threat of significant irreparable harm that cannot be compensated by money alone, Otto requests that this Court grant injunctive relief against Sparber from actual or threatened disclosure or utilization of Otto's trade

secrets, in addition to granting Otto's actual, incidental, compensatory, and consequential damages.

## COUNT III
## BREACH OF FIDUCIARY DUTY

132.    Otto hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 110.

133.    As a director of Otto, the Chairman of the Board and significant shareholder, Sparber had a duty to act in good faith and solely for the benefit of Otto in all matters within the scope of those duties.

134.    Sparber's fiduciary duties included (but were not limited to) the duty to: (a) guard and not misuse confidential and proprietary information of Otto; (b) devote best efforts to Otto's business; (c) not operate a related business competing against Otto while serving as its Chairman; and (d) not interfere with or usurp business opportunities belonging to Otto.

135.    Sparber breached his fiduciary duties to Otto by, among other things: (a) failing to protect the interests of Otto; (b) misusing Otto's confidential and proprietary information; (c) interfering with Otto's relationship and prospective relationship with Vendor A while serving as Otto's Chairman; and (d) interfering with and usurping or attempting to usurp Otto's business opportunities.

136.    Otto has been and continues to be damaged by Sparber's wrongful conduct.

137.    As a result of Sparber's actions, Otto has suffered damages in an amount to be determined at trial, and because its remedy at law may be inadequate or incomplete, seeks preliminary and permanent injunctive relief to recover and protect its property.

55517163.1

138.    Because Sparber's actions have been willful, malicious, outrageous, oppressive, or done in complete disregard of the consequences they might have on Otto, the award of exemplary and punitive damages in an amount to be proven at trial is proper.

**TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY**

139.    Otto hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 110.

140.    As set forth above, Otto has a valid business expectancy with Vendor A. Otto has been negotiating with Vendor A for nearly a year for Vendor A to manufacture its smart ladders. Vendor A has produced a prototype, for which Customer A has placed a multi-million dollar order. Otto has orally agreed to certain terms with Vendor A and is in the process of finalizing a license agreement with Vendor A. Otto and Vendor A have also entered into a non-disclosure agreement relating to Otto's intellectual property and Vendor A's efforts to manufacture Otto's smart ladder.

141.    Sparber was fully aware of Otto's business expectancy with Vendor A, and, in fact, was aware that Otto was negotiating a licensing and manufacturing agreement with Vendor A.

142.    Despite having knowledge of Otto's business expectancy, Sparber intentionally and improperly interfered with Otto's business expectancy by attempting to induce Vendor A's owner to not enter into business with Otto and instead form a joint venture with Sparber, aimed at supplanting Otto in the marketplace.

143.    Sparber's intentional interference was willful, malicious, unjustified, and accomplished through wrongful means, including, but not limited to, knowingly attempting to usurp Otto's business opportunity with Vendor A in favor of his own company.

144.    Sparber's interference with Otto's business expectancy with Vendor A is separate and apart from, and unrelated to, his threatened and/or actual misappropriation of Otto's trade secrets.

145.    As a result of Sparber's tortious interference, Otto has suffered irreparable and other significant injuries.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Otto Ladder Safety, Inc. seeks judgment in its favor and an Order against Defendant Peter Sparber that grants the following relief:

A.    Temporarily, preliminarily, and permanently enjoin Defendant Peter Sparber and all parties in active concert or participation with him, from using or disclosing any of Otto's confidential and/or proprietary information, as well as Otto's trade secrets.

B.    Temporarily, preliminarily, and permanently enjoin Defendant Peter Sparber and all parties in active concert or participation with him, from engaging in or participating in any employment or activity competitive with Otto as it relates to the smart ladder market, including soliciting or attempting to interfere in Otto's relationship with Vendor A, Customer A, other prospective customers about whom Sparber learned during his Otto engagement, or interfering in or competing against Otto in marketing or developing Otto's products.

C.    Ordering Sparber and all parties in active concert or participation with him, to return to Otto all originals and copies of all files, devices and/or documents that contain or relate to Otto's confidential, proprietary, and trade secret information, including without limitation, all computers, electronic media, PDA's and electronic storage devices;

D.    Ordering Sparber and all parties in active concert or participation with him, to preserve all documents, data, and electronic information and to produce for inspection and imaging all computers and other electronic storage devices and email accounts belonging to, under the control of, accessible to, or operated by Sparber;

E.    Awarding Otto actual, incidental, compensatory, and consequential damages to be proven at trial;

G.    Awarding Otto exemplary or punitive damages in an amount to be proven at trial due to Sparber's willful and malicious activities;

29

H.    Awarding Otto all sums disgorged from Sparber based on Sparber's breach of his fiduciary duty to Otto;

I.    Awarding Otto its reasonable attorney's fees and costs; and

J.    Awarding Otto such further relief as the Court deems necessary and just.

## JURY DEMAND

Plaintiff, Otto Ladder Safety, Inc., demands trial by jury on all triable issues.

DATED: MAY 5, 2025                    Respectfully submitted,

                                      **OTTO LADDER SAFETY, INC.**

                                      /s/ *Peter C. Nanov*
                                      Peter Nanov
                                      Saul Ewing LLP
                                      1919 Pennsylvania Avenue, N.W.
                                      Suite 550
                                      Washington, DC 20006
                                      Telephone: (202) 333-8800
                                      Facsimile: (202) 337-6065
                                      peter.nanov@saul.com

                                      Justin K. Beyer*
                                      Saul Ewing LLP
                                      161 North Clark Street, Suite 4200
                                      Chicago, Illinois 60601
                                      Telephone: (312) 876-7100
                                      Facsimile: (312) 876-0288
                                      justin.beyer@saul.com

                                      * pending *pro hac vice* admission

                                      *Attorneys for Plaintiff Otto Ladder Safety, Inc.*

30